Opinion filed May 18, 2006












 
 
  
 
 







 
 
  
 
 




Opinion filed May 18,
2006

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                   __________

 

                                                          No. 11-04-00172-CV 

                                                    __________

 

      TOMASA
RIVERA, INDIVIDUALLY AND AS REPRESENTATIVE OF

         THE
ESTATE OF RAUL RIVERA, DECEASED; ISAIAH RIVERA;

                      JOLENE
RIVERA RANGEL; RAUL RIVERA, JR.;

                                  AND
ERICA J. RIVERA, Appellants

 

                                                             V.

 

              MEISTER
INDUSTRIES, INC. AND LONGHORN CUSTOM

                                         COATING,
INC., Appellees

 



 

                                         On
Appeal from the 161st District Court

 

                                                           Ector
County, Texas

 

                                                Trial
Court Cause No. A-111,506

 



 

                                              M
E M O R A N D U M  O P I N I O N








Appellants,
Tomasa Rivera, Individually and as Representative of the Estate of Raul Rivera,
Deceased; Isaiah Rivera; Jolene Rivera Rangel; Raul Rivera, Jr.; and Erica J.
Rivera (the Riveras) brought this action against appellees, Meister Industries,
Inc. and Longhorn Custom Coating, Inc. (collectively Meister) alleging that, as
a result of Meister=s gross
negligence, Raul Rivera was exposed to dangerous levels of silica dust while
working for Meister as a sandblaster. 
The Riveras alleged that Rivera contracted silicosis as a result of his
exposure to the silica dust and later died from the disease.  After the jury found in favor of the Riveras
on their gross negligence claim, the trial court entered a judgment
notwithstanding the verdict in favor of Meister.  In this appeal, the Riveras challenge the
trial court=s
judgment notwithstanding the verdict. Because there was no evidence that
Meister had an actual, subjective awareness of the risk associated with Rivera=s exposure to silica dust, we affirm
the trial court=s
judgment.                                                                     Background
Facts

Meister was in the business of cleaning, coating,
and painting used oil field equipment and other types of used equipment.  Charlene Meister and her grandson, Billy
Meister Jr., owned the company.  Charlene
and her late husband, Bill Meister, founded the company in 1969.  During the time period relevant to this
appeal, Bill ran the company=s
day-to-day operations and Charlene worked as the company=s
office manager.

Meister=s
employees cleaned the equipment using an abrasive blasting process (often
called sandblasting).  Meister=s employees performed the sandblasting
process outdoors.  The employees  used hoses equipped with nozzles to spray
pressurized air and sand at the equipment to be cleaned. The pressurized sand
blasted away debris, oil, or whatever was on the equipment.  The sandblasting was a dusty process and blew
sand everywhere.

Raul Rivera worked for Meister as a
sandblaster for about four years, from August 1977 until April 1978 and from
July 1978 until May 1981.  During the
time period of Rivera=s
employment,  Meister=s sandblasters wore non-air supplied
canvas hoods B meaning
there was no air line feeding into the hood B
as protection from the sand.  At times,
the sandblasters also wore dust particle masks to keep from inhaling the
sand.  In the mid-1980s, Meister began
providing air supplied hoods to its sandblasters. 

In 1982, Raul Rivera became ill with breathing
difficulties.  In 1984, he was diagnosed
with silicosis, a lung disease caused by prolonged inhalation of silica
dust.  Silicosis is a progressive,
incurable, and painful disease.  The
disease results in a chronic shortness of breath.  Rivera died as a result of respiratory
failure due to the silicosis in 2001.  He
was forty-nine years old.  








The Riveras brought this action against Meister
for gross negligence seeking to recover exemplary damages as permitted by
Article XVI, section 26 of the Texas Constitution and Article 8306, section 5
of the former Workers=
Compensation Act.[1]  The Riveras alleged that Rivera was exposed
to dangerous levels of silica dust as a result of Meister=s gross negligence in conducting
sandblasting operations.  At trial, the
Riveras contended that Meister=s
failure to provide Rivera with an air supplied hood for use during sandblasting
operations constituted gross negligence.

The jury found in favor of the Riveras on their
gross negligence claim and awarded exemplary damages in the amount of
$300,000.  Meister filed a motion for
judgment notwithstanding the verdict based on the following grounds: (1) that
no evidence supported the jury=s
finding of gross negligence, (2) that the Riveras could not recover exemplary
damages because they had not obtained a jury finding on actual damages, (3)
that the jury awarded an excessive amount of exemplary damages, (4) that the
exemplary damages award was subject to the $200,000 cap set forth in Tex. Civ. Prac. & Rem. Code Ann. ' 41.008 (Vernon Supp. 2005), and (5)
that Meister was entitled to an offset on the damages for workers= compensation benefits previously paid
to the Riveras as a result of Raul Rivera=s
death.  Meister also filed a motion to
disregard the jury=s gross
negligence finding and the jury=s
award of exemplary damages.  The trial
court rendered a judgment notwithstanding the verdict, stating that there was
no evidence of probative force to sustain the jury=s
verdict.

                                                                 Issues
on Appeal   

The Riveras present five issues for review.  They argue that the trial court=s judgment notwithstanding the verdict
cannot be sustained on any of the grounds stated in Meister=s motion for judgment notwithstanding
the verdict.

                                                              Standard
of Review








A trial court may disregard a jury finding on a
question that has no support in the evidence and may enter a judgment
notwithstanding the verdict if a directed verdict would have been proper.  Tex.
R. Civ. P. 301.  In their first
issue, the Riveras argue that the trial court erred in granting judgment
notwithstanding the verdict because the evidence was legally sufficient to
support the jury=s gross
negligence finding.  The Riveras had the
burden to prove their gross negligence claim against Meister by clear and
convincing evidence. Tex. Civ. Prac.
& Rem. Code Ann. '
41.003(a)(3) (Vernon Supp. 2005).  In
reviewing the legal sufficiency of the evidentiary support for a finding that
must be proved by clear and convincing evidence, we must consider all the
evidence in the light most favorable to the finding to determine whether a reasonable
trier of fact could have formed a firm belief or conviction that the finding
was true.  Diamond Shamrock Refining
Co. v. Hall, 168 S.W.3d 164, 170 (Tex. 2005); Sw. Bell Tel. Co.
v. Garza, 164 S.W.3d 607, 627 (Tex. 2004); In re J.F.C., 96 S.W.3d 256,
264-65 (Tex. 2002).  When the burden of
proof is by clear and convincing evidence, the evidence is legally insufficient
when no reasonable fact-finder could form a firm belief or conviction that the
matter to be proven is true.  Diamond
Shamrock, 168 S.W.3d at 170; In re J.F.C., 96 S.W.3d at
266.        

                                                                Gross
Negligence

Gross negligence consists of both an objective
element and a subjective element.  See
Lee Lewis Const., Inc. v. Harrison, 70 S.W.3d 778, 785 (Tex. 2001);
Mobil Oil Corp. v. Ellender, 968 S.W.2d 917, 921 (Tex. 1998).  To establish gross negligence, a plaintiff
must prove by clear and convincing evidence (1) that, when viewed objectively,
the defendant=s acts or
omissions involved an extreme degree of risk, considering the probability and
magnitude of the potential harm to others, and (2) that the defendant had an
actual, subjective awareness of the risk involved but nevertheless proceeded
with conscious indifference to the rights, safety, or welfare of others.  Tex.
Civ. Prac. & Rem. Code Ann. '
41.001(11) (Vernon Supp. 2005).  A
consideration of the subjective awareness element determines the outcome of
this appeal.  The issue is whether the
evidence was legally sufficient to prove that, during the period of Raul Rivera=s employment, Meister had an actual,
subjective awareness of the risk posed by exposure to silica dust but
nevertheless proceeded with conscious indifference to Raul Rivera=s rights, safety, or welfare.     

                                                 The Evidence at
Trial

We have reviewed all the evidence, and we
summarize the evidence relevant to the determination of the subjective
awareness element below.

 








Humberto Aguilar=s
Testimony

Aguilar testified that he worked for Meister from
1977 until 1992.  He began his employment
at Meister as a sandblaster, and he sandblasted for one year.  Meister did not provide him with any training
to become a sandblaster.  When Aguilar
began his employment, Raul Rivera was working for Meister as a
sandblaster.  At that time, Meister=s sandblasters wore non-air supplied
canvas hoods when sandblasting.  The
canvas hoods had a piece of glass in the front to look through and some air
holes on the side.  He was instructed to
wear a hood for protection from the sand. 
Aguilar believes that the sandblasters were using the canvas hoods so
that the sand would not hit their eyes. 
He said that sand goes everywhere and piles up during sandblasting.  Aguilar sometimes wore a paper mask to keep
sand from going into his mouth.  Meister=s sandblasters never used air supplied
hoods during the time period that Rivera worked for Meister.  Aguilar became a coater at Meister, but
occasionally went back to sandblasting. 
Starting in about 1986, he wore an air supplied hood while
sandblasting.  Aguilar said that the air
supplied hoods were red and had an air hose attached to them.  Nobody at Meister ever told him that sand
could cause a disease.  Meister began to
have safety meetings in about 1986. 
Aguilar did not know whether Meister knew that the sand could hurt the
employees. 

Joe Calvin Redd=s
Testimony

Redd testified that he went to work for Meister as
a sandblaster in 1982, after Raul Rivera had left his employment with
Meister.  He said that Meister
sandblasted manifolds and fittings, using sand as the abrasive for blasting.  When Redd first started as a sandblaster, he
wore a non-air supplied canvas hood, the same equipment worn by all of Meister=s sandblasters.  Redd also wore a dust particle mask on
occasion to protect himself from the sand. 
The dust particle mask had two yellow bands, and it covered the mouth
and nose.  In about 1984, Meister began
providing air supplied hoods to its sandblasters.  Meister did not have regularly conducted safety
meetings until after Redd had worked for Meister for some time.  To his recollection, in 1982, Meister did not
conduct any air monitoring to determine the concentrations of dust in the
air.  When he started at Meister, no one
warned him that dust could be bad for him. 
Redd heard the word silicosis for the first time in about 1984.  Bill Meister never mentioned silicosis to
Redd, and Redd has no recollection about whether Bill Meister knew about
silicosis.

 








Charlene Meister=s
Testimony

Charlene Meister testified that she and her late
husband, Bill, started Meister in 1969. 
Charlene is currently the president and an owner of Meister.  Meister primarily handles oil field
equipment.  Before the equipment can be
coated and painted, the equipment is cleaned by sandblasting, a process that is
performed outdoors.  The sandblasters use
an air pressure hose with a nozzle attached to it.  During the blasting process, the sand cleans
off debris that is on the equipment. 
Charlene thought that her husband, Bill, was an expert in the sandblasting
field.

Raul Rivera worked for Meister as a sandblaster
from 1977 through 1981.  During that
period, Meister=s
sandblasters wore non-air supplied hoods. 
They also wore white masks with yellow bands.  Charlene testified that Bill was in charge of
keeping up with regulations and safety equipment.  Bill was always aware of safety and
admonished the employees to be safe. 
Charlene said that Bill might have warned Rivera that breathing silica
dust was dangerous.  Charlene said that
Meister changed to air supplied hoods some time in the late-1980s when
companies started manufacturing them. 
Charlene said that she was surprised to hear that air fed hoods have
been around since the 1920s.  Meister did
not have formal safety meetings when Rivera worked for Meister.  Meister began to have safety meetings in the
late-1980s.

Dr. Vernon Eugene Rose=s Testimony

Dr. Rose testified that he is board certified in
industrial hygiene and a certified safety specialist.  Industrial hygiene involves recognition,
evaluation, and control of health and safety hazards in the workplace.  Dr. Rose testified in detail about the hazards
of exposure to silica dust. The risk of overexposure to silica is developing
silicosis and other diseases.








Dr. Rose said that the silicosis problem received
national attention back in the 1930s. 
The Occupational Health and Safety Administration (OSHA) was set up in
1971 to enact and enforce safety and health issues in the workplace.  In the 1970s, OSHA and the National Institute
for Occupational Safety Health (NIOSH) investigated silicosis and other
diseases that do not show up in a person=s
body until many years after the person has been exposed to the cause of the
disease.        Dr. Rose explained that
silica dust is generated when sand is used during abrasive blasting
operations.  Silica dust is a small
particle dust that has no warning properties. 
Silica dust is invisible to the naked eye, and it has no smell or
taste.  On the other hand, large particle
dust has warning properties.  A person
can see large particle dust or can feel it if it gets into the person=s eyes or nose. Small particles of
silica dust stay suspended in the air and may be inhaled into the lungs.  Because silica dust has no warning
properties, a person may inhale it and not even know it.     

Because of the hazards associated with silica dust
exposure, OSHA passed regulations relating to abrasive blasting in 1971.  The regulations require the use of air
supplied hoods for employees holding the nozzle of the air pressure hose during
blasting operations.  Dr. Rose testified
that Meister was subject to the OSHA rules and regulations.  Dr. Rose said that, in 1969, the American
National Safety Institute (ANSI) published a standard recommending that
sandblasters wear an air supplied hood during blasting operations.  In 1974, NIOSH recommended that sand be
banned for use in sandblasting operations. 
However, if sand were used, NIOSH recommended that air supplied hoods be
used for sandblasting.  Dr. Rose
testified that air supplied hoods have been around since at least 1922.

Dr. Rose said that, during the 1970s, employers
with questions about abrasive blasting respiratory protection could have
contacted OSHA, safety supply companies, or sand manufacturers.  In the 1970s, OSHA sent information to
employers about safety in the workplace. 
Dr. Rose said that all corporations have federal identification numbers
for unemployment statistics and other types of reporting. OSHA used a national
list of these corporations when sending out information.

Raul Rivera wore a non-air supplied hood,
sometimes referred to as a desert hood, when he sandblasted for Meister.  While the non-air supplied hoods provided
some protection from large particle dust, they did not provide adequate
protection from exposure to silica dust. 
When a person uses a non-air supplied hood, the person is exposed to a
silica dust concentration of about seventy times the OSHA allowable limit.  A dust mask B
the mask with the yellow bands B
provides very little protection from this amount of silica dust.

Dr. Rose testified that Meister had a duty to
follow OSHA regulations.  Dr. Rose said
that the OSHA regulations required Meister to provide its sandblasters with an
air supplied hood (a hood with a continuous air fed flow-line respirator).  Meister had the duty to keep silica dust
exposure below OSHA=s
allowable limit.  Dr. Rose said that
Meister=s
sandblasting operations also failed to comply with other OSHA regulations.








Dr. Rose testified that a person who uses a
non-air supplied hood for sandblasting is at an extreme risk of overexposure to
silica and developing silicosis and other diseases.  In Dr. Rose=s
opinion, Meister=s failure
to comply with the OSHA regulations on abrasive blasting created an extreme
degree of risk for persons such as Raul Rivera. 
Dr. Rose said that Meister=s
conduct caused Rivera=s
death.

Dr. Rose testified that, in his opinion, Meister
had actual awareness of the hazards of silica dust when Raul Rivera worked for
Meister.  Dr. Rose based his opinion on
the deposition testimony of Charlene Meister. 
Charlene testified in her deposition as follows: (1) that you keep the
sand Aoff of
you if you can, because this is dirty. 
And so you protect yourself from it@;
(2) that the sandblasters wore hoods to deflect the sand to keep Ayou from breathing it@; (3) that the beneficial effect of
wearing a hood while blasting Ais
that it is going to protect you from the bounce back of the sand@; 
(4) that the purpose of the hood was to protect the workers from
breathing the sand; and (5) that the sandblasters wore the dust particle masks
as Aextra protection from breathing the
dust.@   

On cross-examination, Dr. Rose testified that he
did not know whether Meister ever received any warnings about silicosis from
any sand manufacturing companies.  He
also did not know whether Meister ever received any warnings that the sand it
was using contained silica.  Dr. Rose
assumed that Meister had not received any warnings about silica dust because
Bill Meister and his son, Billy, sandblasted using the same equipment as the
employees used.  In the 1970s,
sandblasting companies had a common practice of using non-air supplied
hoods.  Dr. Rose testified that the
dangers of breathing silica were not a matter of ordinary, common
knowledge.  Dr. Rose did not know whether
OSHA had ever cited Meister for any safety violations.  He was aware of Charlene Meister=s testimony that OSHA first visited
Meister after Raul Rivera left his employment. 
Dr. Rose agreed that Meister, as an employer of about twenty-five
employees, was an unsophisticated employer and that many employers of this size
were unlikely to understand the concept of dust that is invisible to the eye
causing damage to the lungs.

Dr. Gerald Abraham=s Testimony








Dr. Abraham testified that he is a pathologist
specializing in the area of occupational and environmentally related
diseases.  Dr. Abraham testified that
Raul Rivera=s death
was caused by silica exposure resulting in silicosis that progressed to the
point where he could no longer breathe. 
Dr. Abraham explained that silica dust particles are invisible to the
human eye.  When silica dust particles
are small enough to stay in the air and get inhaled into the lungs, they are
called respirable.  A person may be
exposed to respirable silica dust and not even know it. 

Tomasa Muro Rivera=s Testimony 

Tomasa Muro Rivera testified that she is the widow
of Raul Rivera.  She said that Raul
Rivera came home covered in sand after his work shifts at Meister.  She said that his hair, face, ears, and
nostrils were completely covered in sand when he came home from work.

                                                      Subjective
Awareness Element

Actual awareness means that the defendant knew
about the peril but its acts or omissions demonstrated that it did not
care.  Ellender, 968 S.W.2d at
921.  The Riveras argue that the evidence
was legally sufficient to prove Meister had an actual, subjective awareness of
the risk posed by exposure to silica dust but nevertheless proceeded with
conscious indifference to the rights, safety, or welfare of others.  The Riveras rely on the following evidence to
support their argument: (1) Charlene Meister=s
statement that Bill Meister might have warned Raul Rivera that breathing silica
dust was dangerous; (2) Dr. Rose=s
opinion testimony that Meister was aware of the hazards of silica dust; (3) Dr.
Rose=s
testimony that Meister was subject to, and failed to comply with, OSHA rules
and regulations regarding abrasive blasting; and (4) testimony that Meister
failed to conduct safety meetings and lacked a corporate safety policy.   








Charlene Meister did not provide any direct
testimony B nor did
any other witness B that
Bill Meister knew of the risks posed by silica dust.  However, the Riveras contend that Bill=s knowledge of the risks may be
inferred by Charlene=s
testimony that he Amight@ have warned Raul Rivera of the dangers
of breathing silica dust.  Charlene=s testimony that Bill Amight@
have warned Rivera gives rise to an equal inference that Bill Amight not@
have warned Rivera.  The equal inference
rule prohibits a jury from inferring an ultimate fact from meager
circumstantial evidence that could give rise to any number of inferences, none
more probable than the other.  Lozano
v. Lozano, 52 S.W.3d 141, 148 (Tex. 2001)(Phillips, C.J., concurring and
dissenting); Hammerly Oaks, Inc. v. Edwards, 958 S.W.2d 387, 392 (Tex.
1997); Mills v. Mest, 94 S.W.3d 72, 74-75 (Tex. App.CHouston [14th Dist.] 2002, pet.
denied).  Thus, in cases with only slight
circumstantial evidence, something else must be found in the record to
corroborate the probability of the fact=s
existence or non-existence.  Lozano,
52 S.W.3d at 148; Beal Bank, S.S.B. v. Schleider, 124 S.W.3d 640 (Tex.
App.CHouston
[14th Dist.] 2003, pet. denied).  

The record does not contain any evidence that Bill
Meister or anyone else at Meister knew of the risks posed by silica dust.  Aguilar testified that nobody at Meister told
him sand could cause a disease and that he did not know whether Meister knew
sand could hurt the employees.  Redd
testified that, when he started at Meister in 1982, nobody at Meister warned
him or told him dust could be bad for him. 
Redd said that he did not hear the word silicosis until about 1984 and
that Bill Meister never mentioned silicosis to him.  Thus, there was no evidence that Bill Meister
warned any other employees about silica dust. 
The evidence showed that, when Bill Meister and Billy Meister
sandblasted, they used the same equipment that Meister=s
employees used.  The evidence supports
the conclusion that Bill Meister did not know of the risks posed by exposure to
silica dust and that, therefore, he did not warn and could not have warned
Rivera about the dangers of silica dust. 
Thus, there is nothing in the record to corroborate the possibility that
Bill Meister warned Raul Rivera about silica dust.  Therefore, the equal inference rule
prohibited the jury from inferring that Bill Meister was aware of the risks
posed by silica dust.  Charlene Meister=s testimony that Bill might have warned
Rivera was no evidence that Meister had actual, subjective awareness of the
risks posed by silica.       

Dr. Rose=s
opinion that Meister had actual awareness of the hazards of silica dust was
based on Charlene Meister=s
testimony.  Charlene testified that
sandblasting was a dirty process and that the sandblasters tried to keep the
sand off of themselves.  She said that
the sandblasters wore hoods to protect themselves from the sand and to keep
from breathing it.  She said that the
hoods protected from the bounce back of the sand and deflected the sand.  Charlene also said that the sandblasters wore
dust particle masks as extra protection from the sand.  








Charlene=s
testimony shows that Meister provided hoods and masks to its employees in an
attempt to protect them from breathing the sand that was used during sandblasting
operations.  Meister also wanted to keep
the sand off of the employees because sandblasting was a dirty process.  Meister was trying to protect the employees
from visible sand that was used during sandblasting operations.  This evidence does not prove Meister knew
anything about the invisible silica dust that was generated during sandblasting
operations.  Thus, while Charlene=s testimony shows that Meister
attempted to protect its workers from the sand that was used during
sandblasting operations, the testimony was no evidence that Meister had any
knowledge about the dangers posed by silica dust or that its sandblasting
operations generated silica dust.

Dr. Rose testified that Meister=s sandblasting operations failed to
comply with OSHA rules and regulations. 
Specifically, he said that the OSHA regulations required Meister to
provide Raul Rivera with an air supplied hood for use in sandblasting.  Dr. Rose also said that OSHA sent safety
information to employers about safety in the workplace.  However, there was no evidence that Meister
was aware of the OSHA rules and regulations, nor any evidence that Meister
received any safety information from OSHA and, specifically, any information
relating to abrasive blasting.[2]  The record shows that OSHA first visited
Meister after Rivera left his employment. 
Additionally, there was no evidence that Meister received, or was aware
of, any information or warnings relating to silica dust from any other source,
such as the NIOSH recommendations or information from sand manufacturing
companies.

The Riveras assert that Meister=s lack of a safety policy and failure
to conduct safety meetings support a gross negligence finding.  These omissions fail to show that Meister
knew anything about the risks of exposure to silica.  Therefore, the absence of a safety policy and
safety meetings will not support an inference of subjective awareness.  Louisiana-Pacific Corp. v. Andrade, 19
S.W.3d 245, 247 (Tex. 1999). 

In Ellender and Lee Lewis, the Texas
Supreme Court upheld jury findings of gross negligence.  The evidence in Ellender showed that
the employer knew about the danger associated with benzene exposure.  Based on that knowledge, the employer went to
great lengths to protect its employees from the benzene risks.  Ellender, 968 S.W.2d at 924.  The employer, however, did nothing to protect
contract workers from the same danger, even though the contract workers worked
side by side with its employees.  The
Texas Supreme Court held the evidence was legally sufficient to prove the
employer had actual awareness of the extreme risk benzene exposure involved but
that the employer nevertheless proceeded in conscious indifference to the
rights, safety, or welfare of the contract workers.  Id. 








The evidence in Lee Lewis showed the
employer knew about the risks of fatal falls at multi-story construction
projects.  Lee Lewis, 70 S.W.3d at
786.  The construction project presented
a fall hazard because workers had to work on the exterior of the ninth and
tenth floors of the building.  Based on
the knowledge of the fall risk, the employer provided its employees with
independent lifelines as part of their fall-protection equipment.  However, although the employer knew that its
subcontractor=s
employees were not using independent lifelines for fall protection, the
employer did nothing to remedy the situation. 
The Texas Supreme Court concluded the evidence was legally sufficient to
prove the employer was subjectively aware of the risk of fatal falls for its
subcontractor=s
employees but that the employer was consciously indifferent to the risk.  Id. at 786. 

This case is factually distinguishable from Ellender
and Lee Lewis.  Here, there was no
evidence, certainly no clear and convincing evidence, that Meister had an
actual, subjective awareness of the risks posed by silica dust.  Additionally, there was no evidence that
Meister knew its sandblasting operations generated any silica dust.  The trial court did not err in granting a
judgment notwithstanding the verdict in favor of Meister.

We overrule the Riveras=
first issue.  Based on our disposition of
their first issue, we need not address their other issues.

                                                               This
Court=s Ruling

We affirm the judgment of the trial court.                         

 

TERRY McCALL

JUSTICE

 

May 18,
2006

Panel consists of:  Wright, C.J., and

McCall, J., and Strange,
J.











[1]Act of March 28, 1917, 35th Leg.,
R.S., ch. 103, part I, ' 5, 1917 Tex. Gen. Laws 269, (repealed
by Act of Dec. 11, 1989, 71st Leg., 2nd C.S., ch. 1, ' 16.01, 1989 Tex. Gen. Laws
114)(amendments omitted)(current version at TEX. LAB. CODE ANN. ' 408.001(b) (Vernon 2006). 





[2]Dr. Rose=s attempt to impute knowledge of OSHA regulations to
Meister was insufficient to establish the required subjective awareness for
gross negligence, as opposed to the lesser standard for ordinary
negligence.